The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. We're going to call the third case, which is Kalos v. Cedar Fair Southwest. The appellant is represented by Mr. John Parker. Mr. Parker, good to have you with us. Good morning, Your Honor, and may it please the Court. I go by Jay Parker, but I am here representing the plaintiff appellant, Mr. Michael Kalos. I'd like to start by not going through an unnecessary rehashing of the procedural history or facts, but actually try to focus us in on actually what the hazardous condition was in this case, because I think this is where the district court got majorly thrown off in the beginning, and I think opposing counsel did a very effective job of briefing this and set up a straw man about what the hazardous condition is in this case. And it set me and the district court chasing down rabbit holes about whether or not my client, Mr. Kalos, about whether his conduct in this case matched the inspection that Carowinds, which is the defendant, asked for. That's the name of the amusement park, Carowinds. Cedar Fair is the defendant's actual name. But it set us off chasing down these rabbit holes of whether or not what he was doing was within the scope of the work order, and that's not what the duty analysis is in this case at all. Why not if they have a written contract for a visual inspection? What other duty is there? So the duty, and this is what we've argued, the duty is the duty that is incumbent on any property owner to warn of hazardous conditions on the property. And so this wrinkle that was thrown into here with having an independent contractor there working, the first, there's two scenarios that can occur when you have this independent contractor coming on to perform work. One is you have a preexisting hazard. And it's not just any independent contractor. It's an independent contractor who calls themselves out to be an expert in this particular field. That's correct. This is not a case where the Carowinds goes down and picks up a day laborer and brings them to the amusement park and says, here, go up and do this, because you've got, it would seem like to me, very different duties depending on the context. Sure. And that could be part of the comparative negligence analysis. That could be part of the open and obvious analysis. But those weren't actually part of the district court's reasons for its order. And the reason was duty. And the duty analysis is a lot more straightforward than that. But duty is a necessary prerequisite. I mean, if you're going to recover in tort, you have to establish the duty before you ever get to a question of causation. Sure. And I'm solely here to talk about duty right now. And so before you determine, the whole duty analysis starts with this in that independent contractor context. You have to decide two things. And this is abundantly clear from all of the case law, from all the jurisdictions that you can look at on this. There's two things. Was the hazardous condition preexisting the invitee's presence on the property? You have to look at it. One, was it that? Or two, was the hazardous condition created by the invitee's conduct on the property? The district court, because of this argument about the scope of the work, got totally wrapped into the idea that this hazardous condition was created by Mr. Kalos. And it ignored evidence in the record that this hazardous condition existed in this machinery and on this property from the moment that that wind seeker was put together on that property. And this is what we've defined as the hazardous condition from the get-go. It is a pinch point in a shiv within that machinery. And this is my partner and boss who's watching me argue right now. He does extensive work in the products context. He'll tell you this hazardous condition, a pinch point, hazard in machinery that's unguarded, someone's hand getting stuck in it, this is one of the most common mechanisms by which someone is harmed by a product defect. So we're not talking anymore about whether or not Mr. Kalos created this condition. We're talking about whether this condition preexisted his invitation onto the property. There is evidence in the record that it most certainly did. So let's assume that we agree with you on all that. I guess the next question, I mean, there's obviously lots of questions about comparative fault and assumption of risk. But before I take your point, that's not the ground on which the district court ruled. But to the extent that we're defining the pinch point as the dangerous condition, how is it not open and obvious? I just sort of feel like, I mean, I'm not a person who works in, like, I just feel like the open, the dangerous condition is that when this metal wire reaches a point of the top of the pulley, where it starts to compress in, if something gets up there, it's going to be really dangerous and bad. Why isn't that an open and obvious danger? So, again, you'd have to look at, I mean, a great place to start is restatement section 343A of defining what open and obvious means. One of the cases that's cited in the brief is if I ask somebody to go up on my roof, I don't have to warn them that roof is really steep. If you fall down, you could definitely fall off it. And if you fall off it, you'd probably get hurt. And I don't have to say that because anybody who literally looks at a steeply slanted roof knows that. And why isn't the analogy anyone who looks at this gigantic pulley mechanism knows if something were to get caught up at the top of that pulley, that would be real bad. It just feels pretty analogously obvious. So, again, what the restatement says and what the case law says, it's not whether or not the hazardous condition is clearly visible, right? Anyone can look there and see it. Nothing's hiding it. It's not hiding behind anything. It's not a hidden trap door. But the question is whether a reasonable person in the injured person's shoes, given all the circumstances, attendant circumstances, whether they would have appreciated the danger created by that, right? So sloped roof, obviously anyone knows. You look at a sloped roof, I can slip and fall off of that. That's just common knowledge. I would agree with that. Now, under these circumstances, again, we have to look. This is summary judgment. So we have to look for evidence supporting. Is it possible that a jury could find that, you know, a reasonable person in Mr. Kalish's position wouldn't have known that that would have seen the shiv and known it was there but not known it was dangerous? And there is evidence in the records supporting this. There is evidence that the way he was trained was to touch this wire rope. The way that he was trained gave no warning whatsoever about this shiv. And so he's going under there and there under this economic compulsion to be there working with the training he's been given, the training that would have been given to any reasonable person in his position. Right. Why would Kara Wins have known that his training was defective? I mean, that would seem to fall back on his employer, not on Kara Wins, because the employer has helped itself out to Kara Wins as being an expert in this, and they have either through this particular entity or the entity that they subcontracted with, they have a history of performing these acts. I mean, I think that's very valid. And that's relevant to an empty chair defense or a comparative negligence analysis. But again, we're talking about duty. And what's getting conflated here is just like take out the independent contractor label, because the thing is, is under the common law. Once you determine that it's a pre-existing hazard that caused injury to the invitee, the subcontractor, that subcontractor, independent contractor label does not matter at all. It is completely irrelevant. What all that matters is now you are in a typical premises liability analysis of duty, which is did the property owner have action? How has Kara Wins ever even bothered to have a contract with these folks? And they represent, you know, we're going to do all these things, and we have this expertise. I mean, I just don't see how you get to kind of elide over duty by moving off to some sort of comparative negligence argument. I'm not. I'm trying to draw us back into duty. And the thing is, is that what we're discussing, well, how are they supposed to know that he was going to do this? In a normal vanilla premises liability context, you can make that same argument about the plaintiff and say the defendant, well, how did he know he was going to step into the trap door? How was I supposed to know he was going to grab that live wire? But the duty analysis has nothing to do with the plaintiff's conduct. If you look at our common law, Wilson v. Duke Power, this is the case where the guy is a subcontractor. He goes up on the roof. He's doing roof construction, roof repair. The property owner knows there's a high-tension, high-voltage wire going right over the property. And the sub is working on that property. The electric power line is open and obvious. He backs up, and either the electricity arcs to him and hits him or he touches it. And the appellate courts in South Carolina have said the duty analysis in that is the exact same as if a customer slips on a grape in a grocery store. Did the property owner have actual notice of the hazard? If the answer to that is yes, they have a duty to warn. It doesn't matter if it's a subcontractor. It doesn't matter if it's an independent contractor. That is what the law says, and that's what got ignored in this case because what's being ignored is that there is evidence that this is a preexisting hazard that was not created by the independent contractor's work. And we've been arguing this from the very, very beginning. And this whole thing gets slipped by. But let's just take everything you all are saying. Assume that what you're saying is true. Oh, but this fellow who he's working for was an independent contractor. I'm sorry, Your Honor. I didn't catch the first part of that. You're saying that it doesn't make any difference that he was an independent contractor. It does make a difference if the hazardous condition is created by his work. For example, here's the perfect counterexample. A plumber comes into your house. You hire the plumber to fix the plumbing in your wall. You don't know anything about plumbing, okay? He comes in. He starts tearing up your wall, busting your pipes apart. They start leaking, and they create a puddle on the floor. You look in to check on his work. You say, oh, there's a puddle on the floor. That's probably not safe. It might be slippery. Well, he's a plumber. I hired him to do his job. I'm not going to tell him how to do his job. The plumber slips in that puddle and falls, okay? You as the property owner, what this independent contractor rule says, you as a property owner, even though you had actual knowledge of that hazardous condition, the puddle, you had no duty to warn him of that because he created that hazard by his work. He did that. In that context, the subcontractor, the property owner, has no duty to tell or interfere in how the subcontractor is doing their work. This is a totally different scenario. My client, Mr. Kalos, did not create the unguarded pinch point on this shiv. He wasn't even there to inspect the shivs, okay? So this is no different than if you hired a sub, same plumber, you hire him to come to your house, okay? He comes to your house. Before he can even get and start working on that plumbing, you've got a trap door, hidden trap door in your bathroom right next to the sink. Can you respond to how this all fits with Laramore? This is the case where my understanding is this is a pallet court, not the Supreme Court of South Carolina, said, right, so the subcontractor is injured by a sinkhole, I think, on the property owner's property, and the court says the homeowner did not have an obligation to tell the sub because the homeowner told the general contractor, and it was the general contractor's job to tell the sub. That was the Lanier case. Lanier, I'm sorry. Thank you for that. Yeah, and that's a really interesting case because it doesn't really get to a detailed analysis of why they say that. The basic takeaway are two things that I can take away from that. One, the court saying, look, the property owner had a duty to warn of that septic tank, same thing as my hidden trap door thing I keep saying, and they did warn of it. They told the contractor, hey, there's a septic tank here. Don't drive over it. I'm just saying that seems hard to square with, Uri. You always have to tell the sub. It doesn't matter that there's a contractor. That's a case in which the state court literally said they told the general contractor there was no further duty to tell the sub. Well, they told him there was no duty, one, because he had discharged his duty by warning the contractor. And in this case, the evidence is clear. I mean, there is no evidence that Carowinds ever told Dynamic Attractions, the contractor, about this pinch point and this shift. Isn't it true that Dynamic Attractions had been to Carowinds before? They'd had other contracts. They'd inspected this ride before. I mean, this was not the first radio forum. Sure, but that doesn't absolve the property owner's duty to warn. There's no case law that says you have a duty to warn of when you have actual notice of a hazardous condition on your property unless the person is an independent contractor. There's no law in any case that says that, especially not in South Carolina. And, in fact, under this Wilson v. Duke case, what the law says is if you have a sub on your property and he gets hurt by a preexisting hazardous condition that wasn't created by the sub's work, then you do have a duty to warn him if you have actual notice of the hazardous condition, which is exactly what happened in this case. And, Your Honors, I'm sorry I went way over there, so thank you for letting me finish that thought. Thank you very much. And you've saved some rebuttal time, Mr. Parker. Ms. Savant, I'm sorry. That's all right. Thank you, Your Honor. May it please the Court, I am Amy Savant, and I am counsel for Defendant Appley's Cedar Fair Southwest Inc., doing business as Carowinds, along with the individual defendants, Craig Kennington and Tim Benz. As this Court has heard and as we have already discussed, this is a hired independent subcontractor inspector trained by his employer who has brought this negligence claim against the landowner when he was entered by an open and obvious hazard. That was related to his inspection when he did work outside the scope of the contract. Plaintiff was to conduct a visual inspection of the wire cables of this amusement park ride, but unbeknownst to the landowner, his intention the entire time was to conduct a tactile inspection, where he was going to hold a- that under South Carolina law, there's a non-delegable duty to warn, regardless of what the contract said, regardless of the prior history of the subcontractor, regardless of whether or not they hold themselves out to be experts in doing this particular act. How do you respond to that? I disagree with that, Your Honor. I think there is a- you have to look at the relationship both of the independent contractor situation and how an independent contractor is, by definition, there and able to use the manner and methods of which- of their choosing to conduct the inspection, and they control the details of the inspection. That has to be interplayed with what duties a landowner owes an invitee. And it is true a subcontractor is an invitee, but with a subcontractor, the subcontractor often has superior knowledge or is thought to have superior knowledge about what it is that they are actually there to do. A landowner has a duty to make the invitee aware of dangerous conditions on the property that exist or where they failed to remedy something. What would you say, counsel, what would you say is your best South Carolina case that is most analogous to what we have here? Yes, Your Honor. And if I'm just real quick to say the next part of that sentence is the really important part of which- because it's where somebody has to be reasonably unaware. And Wilson v. Duke Power says that. And Wilson v. Duke Power is a 1979 case, and this Court of Appeals of South Carolina has dealt a lot more recently with cases regarding subcontractors and landowners and oftentimes affirmed the grant of summary judgment. And I do think one of the strongest cases in our favor is the one Judge Hytens referred to, the Lanier v. Bailey case. That is really strong in our favor because that recognizes the duty the landowner has to the person that it actually hired and the person it has contracted with. And here, Carowinds contracted with Dynamic Attractions, and then Dynamic Attractions actually contracted with TechnoSurf, who was Kalos's employer. And there is evidence in the record that both the witness for Carowinds, Mr. Hutchinson, and Mr. Hopkins, both indicated that the details of how the windseeker inspection was going to take place and recognizing the dangers that existed with them, that was in the record and a part of what was brought up at summary judgment to say we did have conversations with the person we hired and that we had invited onto our property. And that should relieve Carowinds of its duty because the landowner can't necessarily go out until every inspector or contractor that's there on site. Lanier makes clear that it then becomes the responsibility of that contractor to pass on any dangers. So can I ask you, the biggest concern I have with this is I would be totally with you if your client talked to the contractor and then unbeknownst to them, the contractor handed it off to a subcontractor, and unbeknownst to them, the subcontractor sent a guy who wasn't very experienced, and he just goes on the property and gets injured. But a critical factual difference here seems to be that when that guy, that untrained, unsupervised guy, shows up, he was met by two of your company's employees who were told that he was there on behalf of the, you know what I'm saying? It's not like the employees and agents of your company were ignorant that there was a subcontractor, that the subcontractor had sent this gentleman. In fact, they were the last people that he talked to sort of as this inspection is going on and in the moments before his injury occurred. So that seems kind of different than a situation of like I told the contractor and I assumed the contractor would tell the sub and I guess I just assumed that they did. It seems like here there's at least evidence that a jury can find that your client knew that wasn't true. Why doesn't that matter? So the interaction that they had was brief. They did interact with Mr. Kalos as far as actually speaking to him. The difference is is that Carowinds does not have a duty to train subcontractors. It doesn't have a duty to train independent contractors. And so this person who was supposed to come on to the site as an expert and was supposed to be trained and was supposed to have superior knowledge, was supposed to be the one who knew what to do, and then on the other hand had the freedom as the independent contractor to then do the inspection as he wanted. It was in his realm to make those determinations. That's where the independent contractor aspect plays into it as well, Your Honor. What would happen, let's change the facts a little bit and just assume there's no contract for a visual inspection. There's no prior history of Dynamic Attractions having done the inspections. There's no representations from Dynamic Attractions as to what their capabilities are. Carowinds just hires ABC Company. It's an oral contract, and the sole terms of that oral contract are come and inspect this particular ride. So how would that change things here, or would it? I don't think it would change it very much. It takes it a little bit out of the contractual context where you can see what each party was supposed to do. Again, in your hypothetical, I'm not sure if we've brought this person in directly as our contractor or if it's a sub of a sub, Your Honor, but they're still being brought in as the expert. They're still supposed to have superior knowledge. They're still the one controlling it. Have they been brought in in the hypothetical? That's debatable. If the oral contract simply says, we're hiring you to do this inspection and there aren't any parameters as to what the inspection is to entail or how it's to be done, they've just hired Joe Smith to come in and do that, putting aside whether or not that makes sense or not. It seems like to me the duty could change in that circumstance from what we have here. I mean, the duty question and the landowner's duty, it does rely on the circumstances. That is true, and that is in South Carolina case law, where you look at the circumstance of what is being brought in. So potentially it could, but it's still unless Karen Wentz was supposed to train this inspector, and that was part of what the relationship was, if they're still the person that's brought in to do this annual inspection that was a requirement that had to be done, they had done it multiple times with the actual contractor that they had brought in to do that with here, then that, I think your example, depending on a little more facts, could weigh in to whether or not that creates an issue on the duty. Can I go back to what I regard as in many ways the first really questionable move the district court made, which is just buying this idea that, quote, everyone knows that visual inspection means you're not going to touch the rope. So let's say that I have an item that I'm trying to figure out if it's genuine or not, say it's a diamond or a gold coin or something, and I bring it into an expert, and the expert says, well, there's more things we could do later, but the first thing we're going to do is conduct a visual inspection. Does it strike you as at all obvious that that expert's not going to touch the item when conducting a visual inspection? Well, touching an item like a diamond is different than touching moving wire ropes. Maybe, but I guess what I'm saying is it's just not at all obvious to me that the words visual inspection mean that no one's going to touch something. It seems equally if not more plausible to me that visual inspection is a visual like using the tactile senses, including the eyes and maybe the hands, in distinction from a scanning electron microscope or we're going to do an incredibly sophisticated engineering test or we're going to hit this thing with LIDAR or something. That visual is just shorthand for using the human senses as opposed to some sense enhancing technology. In that case, it doesn't seem at all obvious to me that saying he's going to conduct a visual inspection of the rope means as a matter of law, everybody thought he wasn't going to touch the rope. And I think that's where touching the moving wire ropes as they're going into a pulley system. Whoa, whoa, whoa, whoa, whoa. I understand the district courts. I mean, that may go to assumption of risk. That may go to contributory fault because I guess I would say if this case moves any further, I would imagine your client will have a pretty strong argument of how in the world could someone not realize that touching a moving rope is incredibly dangerous. So, like, fair point. But that is not duty. That's assumption of risk. That's contributory fault. But I think I understand the linchpin of the district court's no duty holding to be. It is clearly obvious as a matter of law that this contract did not entail him touching the rope. And it just doesn't at all seem obvious to me from the words of visual inspection as a matter of law that it was everybody, quote, understood he was not going to touch this rope. And that's where I think because it's summary judgment, you look at what all the evidence was. And all the evidence from the various people who were deposed on behalf of Kirwan said, no, when we have people come in to do a visual inspection of the wire rope, I do not think that they're touching the wire rope. It's not what the individual employees of the defendant claim after a horrible thing happened, what they subjectively expected. The question is what a reasonable person could have expected ex ante. Right. And that's where, again, I think you have to look at what it is the person's coming there to inspect. And when they hired people to come do the visual annual inspection, their testimony was that they didn't anticipate it would be touched. And that's and you do look at what the. But it's not again, I guess, like even assuming, even assuming for this, even assuming for the sake of argument that we believe them, that that was their subjective belief. I don't know how you can grant summary judgment on this theory unless you conclude that as a matter of law, no reasonable juror could conclude that that was not an objectively reasonable belief, even if it's subjectively true. And that's where you look at the plain meaning of the contract and to the district court judge. And I think, too, you know, as argued that there was no other interpretation argued. And there's one I just gave you. The one I just the one I just gave you is he's not going to bring any special equipment. He's not going to like do a chemical test. He's not going to hit it with a microscope. He's just going to conduct attack like that's that's the alternative that I'm proffering for you. Why is that objectively unreasonable for summary judgment purposes? I think because you have to look at the amusement park ride context and in that context. But what I'm saying, Your Honor, is plaintiff did not put forward that contention at summary judgment before the court for them, for the court to consider that. And so you're left with the plain language of the of what does visual inspection mean? I do want to stress that there are multiple reasons why summary judgment was proper, not just the visual inspection contract language. But it goes to the open and obvious. And there not being a latent hazard of which defendants needed to make this independent contractor inspector aware, because it's clear from his deposition that he understood how a police system worked. He understood that the ropes were going to be moving. And as your honors, asked in opposing counsel's presentation, you know, the the fact that they were going through a sheave was right there. It's in the pictures that we put in our brief on page seven. His proximity to the sheave, the fact that the ropes were going into the sheave, that's all right there in front of you. And that's part of a functioning pulley system. And so there wasn't anything to warn. The obviousness was right there in front of you. And a quote from the Delia versus Phillips Edison case, which is not a South Carolina case, but it's a case that opposing counsel cited to you said when the claim involves a static condition, if nothing obstructs the invitees ability to see the static condition, the proprietor may safely assume that the invitee will see it and will realize any associated risk. And that would include this pinch point of the sheave because it wasn't hidden. That's part of the pulley system. In a way, a pulley system works on this very large machine that in effect was, you know, made up of a pulley system. And so there wasn't anything to make plaintiff aware there at the summary judgment stage. There was also no showing that the speed of the wire ropes in any way was improper. And that would have been on plaintiff to put forward an analysis of how the rope was improperly running. There was nothing showing that it was anything different than what had been run on these annual inspections and prior times or that the that he asked any more than once for it to be slowing down. And so can I ask you about the speed? Because you assert in your brief, I think at page 12 and page 49 that it literally can't go slower than 10 percent. I'm just having a hard time squaring that with the fact that when the plaintiff asked your clients, employees to slow it down, they said they agreed to do it, which is a little bit hard to square with your claim on appeal that it's literally impossible to slow it down. I think the two employees, I think, testified different. One said it wasn't at 10 percent and that was the slowest. And if they had asked for it to then run any slower that he would have said that's the slowest it goes. I think the other one did say we tried to slow it down or something to that effect. It was a little unclear in that other employee's testimony. But the only clear response was that it was run at 10 percent. But even if it there's also clear testimony that the plaintiff said, could you please slow it down at least once? And there is testimony that one of your client's employees, quote, agreed to do it, right? That's correct, Your Honor. There is that in the in the testimony. There is that. But the issue with the speed is, again, the actual speed it was running was something visible to him. It's not where he couldn't see how fast it was running. He could see how fast it was running and decide whether he wanted to touch it or if he wanted to cancel the inspection and say, I'm not quite sure how I'm supposed to do this because I was touching it. That speed, and if it did get slowed down once, that speed did, he would have observed that. That was an observable condition that he was, if that was the hazard, which that and the actual potential of a defect on the wire rope were the only contentions of negligence the plaintiff put forward at the summary judgment stage. But that also was something known and observable. And so not anything that we had a duty to warn about. The issue, again, is, you know, what was our duty? What did we need to do? I want to make a distinction briefly on the Wilson case that opposing counsel brought up. Not only has the Wilson case been kind of analyzed more thoroughly by Lanier, Laramore, Sides, and Peterson, and many of these dealing with the independent contractor situation, but in Wilson, there the landowner had specifically been told by Duke Power that this is dangerous. We're not going to let you build here. And the landowner had decided to build anyway. And that landowner had not made its general contractor aware that Duke Power had basically said, no, you're not supposed to build here. He had not made that general contractor aware. And so it's not the same position that we have here or that happened in the Lanier case because there the landowner had specifically decided to do something even though had been told not to. That's different where here we just have an amusement park ride that, you know, in and of itself is large. It's high up in the air and has, you know, this pulley system that's there visible and all that it encounters. The proximate cause issue, again, goes to us not knowing that this person was going to be untrained when we hired someone that was supposed to come in with superior knowledge, and we had actually hired a person we had used or a company we had used various times to come in, and so that this independent contractor was going to come in and touch the ropes even though the contract called for a visual inspection. All of that together is not something that was foreseeable to defendants, and thereby not only was there not a breach of any duty, but there was not any proximate cause as to anything that the defendants would have been able to do in this situation. For all these reasons, we would ask that the court affirm the district's court grant of summary judgment in this matter. Thank you. Thank you very much, Ms. Savant. Mr. Parker, you've saved some time. Thank you, Your Honor. All the swords that you all have been poking me with, I'm going to lean into those a little bit, and let's say that everything you all have been arguing about, you're right. The independent contractor is the expert. They are here to perform this task, and the manner of Mr. Kalos's work is how he got injured. Okay, and that's what I heard from all of you all, and let's just say that's all true. This was our alternative argument about why there is a duty to do something, a duty of reasonable care that carowinds had, and the record shows they did nothing. All those arguments you all are making, there is an exception to those arguments, and we argued this in our very first brief. We cited to restatement, second of torts, section 414, and it's called the active participation doctrine, and what that says is if everything you all say is true, and this property owner has invited this sub, a plumber, electrician, whoever, to come onto their property and do skilled work, if the property owner interferes with the operative details of how that independent contractor does their job, now you have created a duty to use reasonable care in those ways that you've interfered with the process, and so this is twofold for us how we've argued this, and the evidence is, again, undisputed in this case. Mr. Kalos wasn't totally in control of how this inspection was carried out. The employees of Carowinds had total control over the speed of those wire ropes. Mr. Kalos's testimony- Hold on, hold on. I've seen this diagram. Did anyone tell him he had to stand that close to the pulley? Because when I look at the diagram, I see a place you could stand that's farther away from the pulley, and it doesn't sound to me like anyone told him he had to stand where he stood. We're just talking about the speed of the wire ropes. Okay, but you just said they were in total control, and I'm just not sure- Of the speed of the wire ropes. Okay, okay. I'm totally just talking about speed of the wire ropes right now. They were in control of that. The testimony is not disputed. They were down in the operation booth. They had their hands on it, had it on. He asked for it to be slowed down. Now, his testimony is they did not slow it down. He asked repeatedly, and I'll correct something. The testimony doesn't just say they didn't slow it down. The testimony from Carowinds employees was that 10% was not the slowest speed. The testimony from Dan Hutchinson, who is the owner of Diamond and Crown. Is there any evidence that speed was a causing factor here? And there is, Your Honor, and the evidence is Mr. Kalos' testimony himself. The district court said, well, it kind of said, you know, where is the evidence of what the reasonable speed was? We don't know that. We don't know what the safe speed is. Well, the testimony is Mr. Kalos' testimony. He's the one who has firsthand knowledge of how this accident happened. He's the person who's been trained to do the wire inspection. He's up there on this platform. Well, other than saying he asked them to slow it down, I mean, where is the evidence that you need speed of X? And if it's not X, then that's particularly dangerous or that's a causative factor. I'm not recalling anything other than Mr. Kalos saying, well, I asked them to slow it down. Well, you'd have to look at it. We cite this in our brief. It's page 999 of the record. It's Mr. Kalos' testimony. This does not take expert testimony or knowledge of what the proper speed is. He says, I was inspecting it. I asked them to slow it down. They wouldn't. It grabbed my hand and yanked it into the shift before I could pull my hand out of the glove. Now, what we are saying, if I can just finish this, is that a reasonable jury could look at that and say, I don't have to know what the safe speed is. If the guy who's doing the inspection tells me it's going so fast that by the time his hand gets caught, he does not have time to pull his hand free of the glove, whatever the safe speed is, this is exceeding it. And he asked them to slow it down. They interfered with how he was doing it. Where have you made that argument before now? We've made this from the get-go, that not slowing down the speed of the wire rope, but for cause and proximate cause of his injury, because he couldn't get his hand out of there. It got yanked into the shift before he had time to react to that. In the proximate cause section of our brief and this appeal, we've put it out there pretty clearly. And it's page 614, page 999. It's in the record. The eyewitness to how this accident is happening, it was going too fast for me to protect myself, for me to get my hand out of there. We don't need to know what the safe speed is. All the jury needs to infer is, is it reasonable to infer that that was unreasonable for them to be operating that fast, especially when he's saying over and over, please slow it down. They're not slowing it down. And they can slow it down to a speed that's 33 percent, according to some of the testimony, of how fast they were operating it. One of the employees said the lowest speed was 3 percent, and they were at 10. So I think there is evidence of the but-for part of proximate cause under South Carolina law. There is evidence that this was foreseeable, because, I mean, this is, you fail to warn of a pinch-point hazard. Someone gets their hand stuck in it. That's the definition of foreseeable, of the likely consequence of you failing to warn someone of something. And so there's the speed issue. But then also the control of the platform. And, Judge, you're correct. There is no evidence that anyone told him to stand on that first platform. But what there is evidence in the record of is that carowinds maintained control of where they inspected from. And these are the documents that we cite to as testimony. The diagram is on page 1324. It shows.  So this is the evidence that you initially cite in a pretty clear violation of Federal Rule of Evidence 407 and then have a fallback position of how it is some permissible uses that don't violate Federal Rule of Evidence 407? Right, because we're using it to show evidence of control over the sub and not to show evidence of liability. Well, OK, so even taking it for that purpose, the fact that they later said you can only stand here, I guess establishes maybe that at the time of this inspection, they could have insisted that he only stand in one place. But I don't think that establishes that they insisted that he stand where he did. I think it's more consistent with the idea of, like, before this accident happened, they left it to the subcontractor to decide where to stand. Well, I think the bigger question is, if they retain the ability to control where he inspected from, which also Mr. Benz, his testimony was, if I would have been up there and seen him standing on that platform, I would have told him to get on the other one, which evinces evidence in the record, summary judgment, some measure of control over not how he's doing the inspection, not how he's looking at that wire rope because it passes by, but where he's doing it from. It evinces some measure of retained control. And then the question isn't, well, you didn't tell him where to stand. The question is, why didn't you tell him the safe place to stand? You had a duty to use reasonable care to exercise that control over how he accessed the tower and where he inspected from, and you did nothing. You told him nothing. It's gross negligence. So I'm well out of time. I appreciate the opportunity to speak to you all today. Thank you. Thank you very much, Mr. Parker. With that, this matter will be taken under advisement, and as I've said in previous cases, if we could do so, we'd agree counsel in the well of the same courtroom, but we can't do that today. We'll have to do that some other time. With that, unless one of my colleagues needs a break.
judges: Robert B. King, G. Steven Agee, Toby J. Heytens